## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**BARRY OCONNOR,**
**INS # A97-957-084,**

       **Petitioner,**

**vs.**                        **Case No. 4:06cv361-SPM/WCS**

**ALBERTO GONZALES,**
**MICHAEL CHERTOFF,**
**MICHAEL ROZOS, DAVID WING, and the**
**DEPARTMENT OF HOMELAND SECURITY,**

       **Respondents.**

_____/

### REPORT AND RECOMMENDATION

On July 24, 2006, this § 2241 case was transferred to this Court from the United

States District Court, Middle District of Florida, doc. 17, having been initially filed in the

Tampa Division of the Middle District on March 27, 2006.  Doc. 1.  Respondents filed

the response to the petition for writ of habeas corpus on July 10, 2006.  Doc. 13.

Petitioner was given an opportunity to file a reply to the response filed by Respondents,

doc. 18, but nothing has been received.

**Allegations of the petition, doc. 1**

In this petition for a writ of habeas corpus, Petitioner seeks release from what is

claimed to be an indefinite period of custody.  Petitioner does not challenge the final

order of removal; rather, he contends that his native country of the Bahamas[1] "has refused to issue travel documents" and, thus, ICE will not be able to deport him in the "reasonably foreseeable future."  Doc. 1, pp. 1-2.  Petitioner alleges he has been held beyond the presumptively reasonable period of detention as established by Zadvydas v. Davis, 533 U.S. 678 (2001), and asserts his entitlement to release.  In particular, Petitioner alleged that he had been detained a total of some 21 months, with the order of removal becoming final on June 3, 2004.  Doc. 1, p. 1.  Petitioner entered into immigration custody on May 12, 2004, and as of this date, has been in custody for over 2 years after issuance of the order of removal.  *Id.*

**Response to the petition, doc. 13**

Petitioner came to the attention of immigration officials when he sought documents to "travel outside the United States."  Doc. 13, p. 2.  He stated that he was "seeking a travel document to travel to Africa after finding out of [sic] his mother passing away."  Ex. 1.[2]  Petitioner was interviewed by officials from the Department of Homeland Security (hereinafter "DHS") and at that time (May 12, 2004), Petitioner stated that he was "born on June 22, 1978, in Algeria and [was] a citizen of Algeria."  Doc. 13, p. 2. He was found, however, to be in possession of a fraudulent Social Security identification card and a fraudulent resident Alien card.  *Id.*  Petitioner could not establish the date, place, or manner of his entry into the United States.  *Id.*; *see also* Ex. 1.  Therefore, Petitioner was taken into custody and transported to Krome Detention Center, placed in

---

[1] Petitioner contends in the petition that he only left his home country to visit and see "what the world ha[d] to offer."  Do. 1, p. 4.

[2] All exhibits referenced are those presented with the response, doc. 13.

removal proceedings, and issued a Notice to Appear.  Doc. 1, p. 2; ex. 2.   The Notice to

Appear, dated May 12, 2004, charged Petitioner as being "an alien present in the United

States who has not been admitted or paroled."  Ex. 2.

Petitioner appeared before an immigration judge (IJ) on June 2, 2004.  Doc. 13,

p. 2.  At that time, Petitioner stated that he entered the United States in 1993, and he

admitted the allegations as contained in the Notice to Appear.  *Id.*  The IJ, therefore,

sustained the charge against Petitioner and he was ordered removed to Algeria.  *Id.*;

*see also* Ex. 3.  Petitioner waived his right to appeal.  Doc. 13, p. 2; Ex. 3.

DHS began the removal process on July 28, 2004, by requesting travel

documents for Petitioner from the Algerian Consulate.  Doc. 13, p. 2; ex. 4.  The

Embassy of Algeria, however, responded by indicating Petitioner was neither a native

nor a citizen of Algeria.  Doc. 13, p. 2.  Petitioner was advised of that communication by

Defendant David Wing, and directed on September 15, 2004, to provide additional

documents and information to assist in obtaining travel documents for him.  Doc. 13, p.

2; ex. 5.  Specifically, Petitioner was ordered to provide a birth certificate, passport, and

any identifying documents such as his town or village of birth, numbers and/or "names

of individuals that can vouch or assist in the issuance of a document."  Ex. 5.

On September 23rd, Petitioner was served with documents concerning his

upcoming custody review on October 15, 2004, and simultaneously provided with an

instruction sheet as to Petitioner's obligation to assist in the removal process and a

notice of Warning for Failure to Depart.  *Id.,* at 3; Ex. 6.  The notice advised Petitioner

that he could be subjected to criminal penalties including imprisonment for actions taken

which would prevent or hamper efforts being made for his departure.  Ex. 6.  One page

of the instruction sheet listed several mandatory requirements an alien must do to assist an INS officer in obtaining travel documents. *Id.* The form, however, had no boxes checked indicating Petitioner was required to provide additional information. *Id.*

On January 7, 2005, an immigration officer took a sworn statement from Petitioner. Ex. 7. Petitioner reaffirmed his assertion that he was a citizen of Algeria, was born on June 22, 1978, in Algeria, but he stated that he did not know the name of the city where he was born. *Id.* Petitioner claimed to have last entered the United States in 1994 in Miami, Florida. *Id.* Petitioner was given a photo from the Broward County Sheriff's Department and said it was not a photo of him, that he had never been arrested in the State of Florida, had not used any other names, and confirmed that his name is Barry Oconner.[3] Petitioner was either "unable or refused to provide DHS with documents or information to pro vide his identity or country of birth and citizenship." Doc. 13, p. 3; *see also* ex. 7. DHS issued a notice on January 7, 2005, of their decision to continue Petitioner's detention due to his failure to make good faith efforts to assist in obtaining a travel document. Ex. 8. In particular, the notice stated that Petitioner had refused "to produce [his] passport" and was not cooperating with his "Consulate in obtaining an emergency travel document . . . . " *Id.* Another Instruction Sheet was given to Petitioner on January 7th, and once again, none of the boxes were checked indicating the documents Petitioner was required to provide to immigration officials. *Id.*

---

[3] It is unclear whether the information written on the form was by Petitioner or the officer doing the questioning, but the surname on that form is spelled differently than the Petitioner's surname in this case. Here, Petitioner used the name "Oconnor" when he signed his petition, but on that form, ex. 7, it is spelled "Oconner."

On January 14, 2005, Petitioner was presented with another letter concerning his custody review.  Ex. 9.  The letter informed Petitioner that ICE had determined that he should continue in detention based on his failure to cooperate.  *Id.*, *see also* doc. 13, p. 3.  Petitioner was advised that it had been determined that he was not indicating his "true identity" which was, obviously, hampering his removal.  Ex. 9.  One of the documents presented with the "post order custody review worksheet" indicated that contrary to Petitioner's earlier statements, he did have a criminal history.  Ex. 9.[4]

Moreover, the Officer's Analysis and Recommendation form (presented with Exhibit 9) provides additional information that the Algerian Consulate stated on September 12, 2004, that Petitioner was "neither a native nor a citizen of Algeria, and" they "would not be issuing a document to Mr. Oconner."  *Id.*  On September 17, 2004, and again on November 30, 2004, a fingerprint analysis request was sent to the FBI to determine Petitioner's identity.  *Id.*  That reply indicated Petitioner's real name was Franky St. Fluer from Haiti, but further investigation has revealed that is another person. *Id.* Thus, because Petitioner's "true identity [had] not been established," it was recommended that petitioner continue in detention.  Ex. 9; *see also* doc. 13, p. 3.

It was not until May of 2005, that Petitioner "informed DHS that he was not an Algerian citizen, but instead a citizen of the Commonwealth of the Bahamas."  Doc. 13, p. 4.  Respondent Michael Rozos sent a formal request to the Consulate general of the Bahamas requesting the issuance of travel documents for Petitioner.  Doc. 13, p. 4; ex. 22.  On April 6, 2006, the Bahamian Consulate informed DHS that Petitioner "was not a

---

[4] On the court's electronic docket, that criminal history is located on page 36 of doc. 14.

native or citizen of the Bahamas."  Doc. 13, p. 4.  A written denial from the Consulate

was supposed to be forthcoming, but as yet, has not been received by Respondents.

Doc. 13, p. 4.

Respondents have submitted evidence that a multitude of reviews of Petitioner's

custody status have been made.  Exhibits 10-21.  At each occasion, the decision is

made to continue Petitioner's detention due to his "failure to comply with his obligation

to assist in obtaining travel documents."  Doc. 13, p. 4.  That decision is further

supported by a failure to confirm Petitioner's true identity and his country of citizenship.

*Id.*  As early as November 30, 2004, Petitioner was notified that DHS had learned

Petitioner had not provided his true identity, and he has continued to not prove his

identity to DHS.  Ex. 10.  Petitioner continues to refuse "to make timely and good faith

efforts to obtain travel or other documents necessary for his removal."  Doc. 13, p. 4.

He has been consistently advised by DHS that the removal period is extended because

he is preventing his removal and that he will remain in custody until he is able to

demonstrate that he is making "reasonable efforts to comply with the order of removal,

and that [he is] cooperating with" the United States' efforts to remove him.  Exhibits 10

(February 23, 2005); ex. 11 (March 23, 2005); ex. 12 (April 25, 2005); ex. 13 (May 25,

2005); ex. 14 (June 25, 2005); ex. 15 (July 21, 2005); ex. 16 (August 22, 2005); ex. 17

(October 19, 2005); ex. 18 (December 14, 2005); ex. 19 (February 28, 2006); ex. 20

(April 3, 2006); and ex. 21 (April 19, 2006).  Those latter Instruction Sheets reveal that

every box on the forms was checked indicating numerous documents Petitioner was

required to submit to DHS officials.  Specifically, February on 23, 2005, Petitioner was

directed to submit passports; apply for a travel document or passport from his embassy

or consulate; comply with instructions from the embassy or consulate, submit birth

certificates or national identification cards or other documents indicating citizenship,

nationality, and place of birth; provide names and addresses of family or friends in the

United States; provide names and addresses of family or friends in his country of

citizenship; provide ICE with written copies of requests to embassies or consulate

requesting issuance of a travel document and any responses to those requests; and

solicit permission from another country to accept him so that he could be removed

there.  Ex. 10.[5]  There is no evidence that Petitioner has provided any documentation to

Respondents to assist in the removal process, and Petitioner has not replied in any way

to the Government's response to this § 2241 petition.

**Analysis**

This Court has jurisdiction over this § 2241 habeas petition since Petitioner is not

challenging a final order of removal, but only seeking release from what he asserts is an

unlawful and indefinite period of detention pursuant to Zadvydas v. Davis, 533 U.S. 678,

121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).  Doc. 1.  In Zadvydas, the United States

Supreme Court considered a challenge to 8 U.S.C. § 1231(a)(6) and was asked to

decide whether the statute authorized indefinite detention of a removable alien.[6]  The

Court held that the continued detention of legal permanent aliens beyond the mandated

90-day removal period was permissible under the Constitution, but only for as long as

---

[5] It is noted that not all of the instruction sheets have checkmarks indicating documents Petitioner was to provide.  Nevertheless, as noted above, Petitioner has not shown that he responded even where there is proof that he was specifically advised of additional information he must provide.

[6] Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  8 U.S.C. § 1231(a)(1)(A).

was "reasonably necessary to bring about that alien's removal from the United States."
*Id.*, at 689, 121 S. Ct. at 2498.  The Court interpreted the statute to avoid constitutional
threat by concluding that "once removal is no longer reasonably foreseeable, continued
detention is no longer authorized by statute."  *Id.,* at 699, 121 S.Ct. at 2503.  For the
sake of uniform administration by the federal courts, the <u>Zadvydas</u> Court held that "the
presumptive period during which the detention of an alien is reasonably necessary to
effectuate his removal is six months; after that, the alien is eligible for conditional
release if he can demonstrate that there is 'no significant likelihood of removal in the
reasonably foreseeable future.' "  <u>Clark v. Martinez</u>, 543 U.S. 371, 125 S.Ct. 716, 722,
160 L.Ed.2d 734 (2005), *quoting* <u>Zadvydas</u>, 533 U.S. at 701, 121 S.Ct. at 2505.

In <u>Clark v. Martinez</u>, *supra*, the Court extended its interpretation of 8 U.S.C. §
1231(a)(6) to inadmissible aliens.[7]  The Court concluded that there was no reason why
the period of time reasonably necessary to effect removal would be longer for an
inadmissible alien than for an admissible alien.  <u>Clark</u>, 543 U.S. at 386, 125 S.Ct. at
727.  Thus, it held that the 6-month presumptive detention period prescribed in
<u>Zadvydas</u> should be applicable.  *Id.*  Accordingly, under <u>Clark</u> and <u>Zadvydas</u>, when an
alien shows that he has been held more than six months beyond the removal period
and his removal is not reasonably foreseeable, a § 2241 petition should be granted.
<u>Clark</u>, 543 U.S. at 386-387, 125 S.Ct. at 727; <u>Benitez v. Wallis</u>, 402 F.3d 1133, 1135

---

[7] The relevant statute provides: "An alien ordered removed who is inadmissible
under section 1182 of this title, removable [for violations of nonimmigrant status or entry
conditions, violations of criminal laws, or threatening national security] or who has been
determined by the Attorney General to be a risk to the community or unlikely to comply
with the order of removal, may be detained beyond the removal period and, if released,
shall be subject to the terms of supervision in paragraph (3)."  8 U.S.C. § 1231(a)(6),
*quoted in* <u>Benitez v. Wallis</u>, 402 F.3d 1133, 1134 (11th Cir. 2005).

(11th Cir. 2005) (relying on Clark to hold that "an inadmissible alien can no longer be detained beyond the statutory 90-day removal period of § 1231(a)(1), where there was no significant likelihood of removal in the reasonable foreseeable future.").

Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  8 U.S.C. § 1231(a)(1)(A).  However, the removal period "shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).[8]  Accordingly, the statute expressly permits an alien to be detained longer than the presumptive removal period, where the alien acts to prevent his removal.  Therefore, in considering whether there appears to be no significant likelihood of Petitioner's removal in the reasonably foreseeable future, the Court must consider whether Petitioner's removal has been delayed or extended by Petitioner's own efforts.

In Sango-Dema v. District Director, I.N.S., 122 F.Supp.2d 213 (D. Mass. 2000),[9] the court denied habeas relief where the Petitioner was found to be "the cause for the long delay."  The court stated, "[e]ven if this Court were to agree with the courts recognizing a constitutional right to be free from indefinite detention by the INS, an alien cannot trigger such a right with his outright refusal to cooperate with INS officials."  Sango-Dema v. District Director, I.N.S., 122 F.Supp.2d at 221.

---

[8] During the "removal period" an alien must be detained.  8 U.S.C. § 1231(a)(2).

[9] This case was decided before Zadvydas.

In Powell v. Ashcroft, 194 F.Supp.2d 209 (E.D.N.Y. 2002), a case decided in the wake of Zadvydas v. Davis, the court noted that Zadvydas was concerned with the constitutionality of § 1231(a)(6) where aliens were in " ''deportation limbo because their countries of origin had refused to allow [them] entrance.' " Powell, 194 F.Supp.2d at 211, citing Sango-Dema, 122 F.Supp.2d at 221 (explaining Zadvydas).  The court held that Zadvydas was inapplicable because it "did not discuss the constitutionality of Section 1231(a)(1)(C) and the tolling of the removal period during the time of an alien's non-cooperation."  Powell, 194 F.Supp.2d at 212, citing Guner v. Reno, 2001 WL 940576 (S.D.N.Y. Aug. 20, 2001).  The court held that petitioner's continued detention was appropriate because he had not "provide[d] accurate and complete information to the INS," and that after he did so, it was likely that he would be removed.  Powell, 194 F.Supp.2d at 212.  See also Archibald v. I.N.S., 2002 WL 1434391, *8 (E.D.Pa. July 1, 2002) (finding the case factually distinguishable from Zadvydas where "Archibald's detention [was] a direct result of his seeking relief from deportation" and holding that because his indefinite detention was a result of his requesting a stay, he could not "be heard to complain[] that the time period during which he has been detained constitute[d] a denial of due process."); Thevarajah v. McElroy, 2002 WL 923914 (E.D.N.Y. Apr. 30, 2002)(holding that petitioner's nearly five years in the custody of INS was constitutional following Zadvydas because the continued detention was lengthened largely because of petitioner's own actions); cf. Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C. July 22, 2002) (rejecting respondent's argument that petitioner "has not cooperated in obtaining travel documents because he told Liberian officials that he did not want to return to Liberia" and noting that INS had not argued that "petitioner refused to request

travel documents or refused to be interviewed by Liberian officials" and did not deny "his Liberian citizenship, or gave false or misleading information that impeded the issuance of travel documents.").

Another recent case on this issue is <u>Pelich v. I.N.S.</u>, 329 F.3d 1057 (9th Cir. 2003), in which the court found that petitioner's detention was "indefinite only because he refuse[d] to cooperate with the Immigration and Naturalization Service's ("INS") efforts to remove him."  <u>Pelich</u>, 329 F.3d at 1057.  Thus, the court concluded that in those circumstances, the petitioner had "no cause to complain" and the denial of his § 2241 habeas petition was affirmed.  329 F.3d at 1057-58.

Accordingly, there is ample case law to support the finding that an alien's removal period may be tolled where the alien acts to frustrate the Government's efforts to effect his or her removal.  *See* <u>Rajigah v. Conway</u>, 268 F.Supp.2d 159, 165 (E.D.N.Y., 2003), *citing* <u>Powell v. Ashcroft</u>, 194 F.Supp.2d 209, 210 (E.D.N.Y. 2002); <u>Akinwale v. Ashcroft</u>, 287 F.3d 1050, 1052 (11th Cir. 2002); <u>Seretse-Khama v. Ashcroft</u>, 215 F.Supp.2d 37, 50-53 (D.D.C. 2002); *but see* <u>Ford v. Quarantillo</u>, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).  Although an alien's statements that he did not want to be returned to his country of origin should not be considered an act of failing to cooperate under § 1231(a)(1)(C), actions and statements which prevent and block removal are actions of "bad faith" and will extend the removal period and post-order

detention period.  *See* Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37, 50-53 (D.D.C. 2002);[10] Rajigah v. Conway, 268 F.Supp.2d 159, 165 (E.D.N.Y., 2003).

In this case, Petitioner's actions must unquestionably be viewed as having hindered in his removal efforts.  At the outset of this detention in May of 2004, he presented a fraudulent social security card and a fraudulent resident alien card. Petitioner then asserted on several occasions that he was a citizen of Algeria.  In January of 2005, Petitioner submitted sworn statements attesting to his Algerian citizenship.  Eventually, DHS even sought the assistance of the FBI in trying to determine Petitioner's identify because of his lack of cooperation.

Petitioner now asserts his Bahamian citizenship, and makes a broad assertion in his petition, doc. 1, that he has requested travel documents twice, and called the

---

[10] In a footnote, the court surveyed the case law on the issue of what "constitutes an affirmative act that prevents one's return" or removal:

> Furthermore, most of the case law was decided before the Court's ruling in Zadvydas.  *See, e.g.*, Bini v. Aljets, 2002 WL 535083, 36 Fed.Appx. 868 (8th Cir. 2002) (alien who obtained stay of proceedings in district court prevented his removal); Powell v. Ashcroft, 194 F.Supp.2d 209, 210-211 (E.D.N.Y. 2002) (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false name and false date of entry, prevented his removal); Riley v. Greene, 149 F.Supp.2d 1256, 1262 (D.Colo. 2001) (alien who admitted he refused to complete travel arrangements and refused to name any country for deportation); Sango-Dema v. District Director, 122 F.Supp.2d 213, 221 (D.Mass. 2000) (alien who refused to provide passport and birth certificate, and refused to communicate with embassy officials or complete application for documents); Ncube v. INS, 1998 WL 842349, *16 (S.D.N.Y. Dec. 2, 1998) (failing to provide INS with passport or proof of identification or nationality; many statements false or at least contradictory); *cf.* Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).

215 F.Supp.2d at 51, n.18.

consulate three times to ask for travel documents.  However, Petitioner has not provided any evidence of those efforts.  Petitioner was given numerous notices by DHS requiring his assistance and directing him to submit certain documents and information so that travel documents could be obtained.  There is simply no demonstration in this case that Petitioner has provided Respondents with any of the requested documents to verify his citizenship.  Petitioner has given false and misleading information, he has not properly identified his citizenship, and his actions have impeded the issuance of travel documents and, correspondingly, his release from detention.  Considering the lingering questions which exist as to Petitioner's true identity and country of citizenship, it cannot be determined that he faces an indefinite period of detention because a requesting country unfairly refuses to issue him travel documents.  At this point, Petitioner's continued detention is caused by his own actions.  Thus, Petitioner's six-month period of removal pursuant to Zadvydas has been tolled as permitted by 8 U.S.C. § 1231(a)(1)(C).  In other words, the period of time by which an alien is non-cooperative, tolls the six months of presumptively reasonable period of time for removal as announced in Zadvydas.  *See* Francois v. Chertoff, 2006 WL 2668193, *3 (D.N.J., 2006)(citations omitted).

Accordingly, it is **RECOMMENDED** that the petition for a writ of habeas corpus, doc. 1, filed by Barry O'Connor pursuant to 28 U.S.C. § 2241, be **DENIED.**

**IN CHAMBERS** at Tallahassee, Florida, on October 24, 2006.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.